CARLTON DAHLBORG, trustee, vs. MIDDLEBOROUGH
TRUST COMPANY.

Plymouth. April 13, 1983. — August 5, 1983.

Present: GRANT, ARMSTRONG, & KASS, JJ.

*Trust,* Breach of trust. *Bank. Consumer Protection Act,* Businessman's
claim, Damages. *Damages,* Consumer protection case.

A bank which wrongfully allowed a depositor, the former trustee of a
trust, to divert funds of the trust to discharge his personal obligations
to the bank was liable to the trust for the funds so diverted; however,
the amount of the judgment was to be reduced to take account of a
sum to which the bank was entitled as the holder in due course of a
note which the depositor, acting within his powers as trustee, had ex-
ecuted on behalf of the trust. [484-485]
A bank which wrongfully allowed a depositor, the former trustee of a
trust, to divert funds of the trust to discharge his personal obligations
to the bank would be subject to provisions of G. L. c. 93A, § 11, im-
posing multiple damages. [485-487]

CIVIL ACTION commenced in the Superior Court Depart-
ment on November 7, 1980.

The case was heard by *Roger J. Donahue,* J.

*Richard J. McCarthy* for the defendant.

*Francis J. Lynch, II,* for the plaintiff.

KASS, J. Middleborough Trust Company (bank) per-
mitted a trustee to use what it knew to be trust money to dis-
charge a personal debt owed to the bank by the trustee. The
bank is liable for participation in the breach of trust, Re-
statement (Second) of Trusts § 324 (1959), and is liable, as
well, under G. L. c. 93A, § 11.

We proceed to the facts which the jury could have found.
Carlton Dahlborg and his wife Margot owned a fifty-acre
dairy farm in Bridgewater. In September, 1976, they
reached an agreement with Everett L. Estabrooks for the

development of their land into a housing subdivision, pursuant to which they conveyed their land to Estabrooks as the trustee of a newly created trust called "Spring Acres Realty Trust." Under the declaration of trust (dated September 15, 1976), Estabrooks was granted broad powers as trustee to deal in property, borrow money, issue notes, and execute instruments for trust purposes. A schedule of beneficiaries, annexed to the declaration of trust and registered, together with the declaration, in the Plymouth registry district of the Land Court, disclosed that the Dahlborgs had a ninety percent beneficial interest in the trust and that Estabrooks had the remaining ten percent.

Bridgewater's planning board, in connection with approval of a sixty-four lot subdivision proposed by Estabrooks, required a deposit of $75,000 to secure completion of the subdivision road. To that end, Estabrooks borrowed $75,000 from the bank. The name typed by the bank on a demand note as that of the party taking out the loan was Spring Acres Realty Trust. Estabrooks signed the note on its behalf as trustee and signed the note a second time, presumably to evidence his personal liability. In this and other respects the note was inartistically drawn. Upon receiving the proceeds, Estabrooks deposited them at once in a savings account with the bank in the name of Spring Acres Realty Trust, Everett L. Estabrooks. He then conditionally assigned the savings account to the town of Bridgewater in fulfilment of the trust's obligations to secure its road covenants. See G. L. c. 41, § 81U.

On September 26, 1978, Estabrooks, as trustee, received another loan from the bank in the amount of $58,577. Of this money, $8,577 was used to pay the balance due on the original $75,000 loan; the remaining $50,000 was requested "to complete construction of roads at Spring Acres." Estabrooks executed a note for $58,577, drawn in substantially the same manner as the first one, again signing once as trustee and once individually. To secure the new loan he made a junior assignment to the bank of the savings account which the trust had earlier assigned to the town to secure its

subdivision covenants; i.e., the bank's rights in the account were contingent upon the town's releasing its interest.

By late 1979 thirty-two lots had been sold, but the Dahlborgs had received only $10,000 of $300,000 in trust funds Estabrooks had "handled." The trust was in serious financial difficulty, and the Dahlborgs' home, located on trust property, was threatened with foreclosure. They retained an attorney, a Mr. Lynch, who investigated the affairs of Estabrooks and the trust and promptly filed a complaint against Estabrooks. On June 9, 1980, Estabrooks resigned as trustee and appointed Carlton and Margot Dahlborg as successor trustees.[1] Mr. Lynch notified the bank of Estabrooks' resignation, first by phone, then by letter, and then during a personal meeting between himself and Richard Briggs, vice president of the bank, which took place in September, 1980. At that meeting Mr. Lynch told Briggs not to honor any transactions attempted by Estabrooks on the account. Mr. Lynch, during the course of the meeting, learned for the first time about the second loan (i.e., the one for $58,577) to the trust negotiated by Estabrooks and the bank's junior interest in the trust's savings account.

At Mr. Lynch's urging, Bridgewater released its interest in that savings account on November 3, 1980. On November 5, Mr. Lynch so informed Briggs and demanded release of the funds to the Dahlborgs. Briggs refused, maintaining that the bank had a right to the funds in the account under the assignment to the bank made in connection with the second loan. The next morning Mr. Lynch called Briggs by telephone and informed him he would go to court on the following day to seek a temporary restraining order immobilizing the funds until a court determined who was entitled to them. Briggs represented that he would not permit the funds to be disbursed until a court order had issued.

---

[1] By its terms, the declaration of trust provided for only one trustee. The amended complaint describes Carlton Dahlborg as one of two cotrustees. Mrs. Dahlborg has not been made a party to this action.

Within a matter of hours after this conversation, the bank permitted Estabrooks to withdraw the entire account "individually"[2] and to apply the proceeds first to pay off the note on which he and the trust were jointly liable (which with interest had grown to $61,348.88) and the rest to his personal indebtedness to the bank ($16,358,67), which the bank knew was unrelated to the affairs of the trust.[3]

In response to special questions (Mass.R.Civ.P. 49[a], 365 Mass. 812 [1974]), the jury found, in addition to the matters referred to in note 2, *supra,* that the bank had wrongfully allowed Estabrooks to divert the funds of the trust to discharge his personal obligations, that in consequence the trust suffered a loss, and that the loss amounted to $77,707.55.

1. *The bank's liability for wrongful diversion.* The bank's liability is anchored in well established trust principles requiring disgorgement where a bank has accepted what it knows to be trust funds to pay a trustee's private debt. *National Bank* v. *Insurance Co.,* 104 U.S. 54, 64-66 (1881). *Shaw* v. *Spencer,* 100 Mass. 382, 392 (1867). *Allen* v. *Puritan Trust Co.,* 211 Mass. 409, 422 (1912). *Tingley* v. *North Middlesex Sav. Bank,* 266 Mass. 337, 339-340 (1929). *Tierney* v. *Coolidge,* 308 Mass. 255, 259 (1941). *Milbank* v. *J.C. Littlefield, Inc.,* 310 Mass. 55, 65 (1941). See generally Loring, A Trustee's Handbook (6th ed. 1962) § 111 at 282; 4 Scott, Trusts §§ 324, 324.1-324.4 (3d ed. 1967); Annot., Bank's Right to Apply Third Person's Funds Deposited in Debtor's Name on Debtor's Obligation, 8 A.L.R. 3d 235, § 5(e), at 245-246 (1966); Restatement of Restitution §§ 160 and 168 (1937). On the facts here presented, the bank would have been liable even if the funds had been in an account listing only Estabrooks individually. *National Bank*

---

[2] When Estabrooks opened the account, he had signed a signature card first as "Everett L. Estabrooks, trustee" and then as "Everett L. Estabrooks." The type of account was indicated as "joint." It is the bank's theory that this permitted the disbursement of the trust account to Estabrooks. The jury specifically found the account to be an individual account owned by the trust.

[3] With interest, the account had grown in value to $77,707.55.

v. *Insurance Co., supra.* *Allen* v. *Puritan Trust Co., supra,* at 420. 4 Scott, Trusts § 324.4, at 2535 & n.5. Needless to say, it follows there is no merit to the bank's argument that it was entitled under G. L. c. 172, §§ 51 and 52, as in effect prior to St. 1982, c. 155, § 60, to permit Estabrooks as joint payee to draw on a joint account.

The jury's verdict, however, failed to take into account that not all of the $77,707.55 in the trust's account was improperly diverted. Upon release by Bridgewater of its interest in the account, the funds in it became available to the bank as security for its loan of September 26, 1978. *Great Am. Indem. Co.* v. *Allied Freightways, Inc.,* 325 Mass. 568, 570-571 (1950). The bank, albeit somewhat inarticulately, pleaded its right of set-off in its amended answer. Making the assignment and executing a note on behalf of the trust were well within the powers granted Estabrooks in the trust agreement. The note was commercial paper;[4] no evidence whatsoever was presented why the bank should not be considered a holder in due course[5] or that a defense on the note was available to the trust.[6] A refusal to relinquish $61,348.88 would, therefore, have been proper. Compare *First Natl. Bank* v. *Slade,* 379 Mass. 243, 248 (1979), and *Superior Glass Co.* v. *First Bristol County Natl. Bank,* 380 Mass. 829, 833 (1980).

2. *The c. 93A claim.* Following the jury verdict, the trial judge heard the claim under G. L. c. 93A. Since the transactions complained of took place in a business context, see *Linthicum* v. *Archambault,* 379 Mass. 381, 387 (1979), and *Lynn* v. *Nashawaty,* 12 Mass. App. Ct. 310, 313 (1981), the judge correctly considered the action under G. L. c. 93A, § 11.[7] No demand letter was, therefore, required. *Nader* v. *Citron,* 372 Mass. 96, 101 (1977).

---

[4] G. L. c. 106, § 3-104.

[5] G. L. c. 106, § 3-302.

[6] G. L. c. 106, § 3-305.

[7] Given our disposition of the matter, we need not consider the judge's alternative findings under § 9.

There was ample evidence to warrant the trial judge's conclusion that the bank had knowingly acted unfairly by permitting Estabrooks to withdraw the trust funds and use them to discharge his personal obligations to the bank. This lies well within "the penumbra of some common-law . . . concept of unfairness." *PMP Associates, Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975), quoting from *FTC* v. *Sperry & Hutchinson Co.*, 405 U.S. 233, 244-245 n.5 (1972), and well within the penumbra of action proscribed by § 11. See *Raymer* v. *Bay State Natl. Bank*, 384 Mass. 310, 318-319 (1981). Since the trust was deprived of $16,358.67 of its money, there is no want of causal connection between the bank's misconduct and the plaintiff's loss. See *Guenard* v. *Burke*, 387 Mass. 802, 810 (1982); *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 850 (1983).

In assessing damages under c. 93A, the judge doubled the damages found by the jury and found that the fair and reasonable value of the legal services which the plaintiff had required in connection with the c. 93A claim was $18,500, together with $841.04 in costs. In view of the reduction in common law damages which results from part 1 of this opinion, we think it appropriate to remand the case to the trial judge to give him an opportunity to reconsider the proper damages under c. 93A, § 11, i.e., whether the damages should be double or treble damages. The parties have evinced some confusion about the meaning of the judgment appealed from. The judge had ordered entry of judgment on both counts of the complaint in "the total amount of $174,756.14," i.e., double the damages, plus fees and costs. Judgment entered in that amount on count 2 only, causing the bank, at least, to apprehend that judgment might still enter on the common law count of the complaint. A motion to correct the judgment in a fashion which expressed that it disposed of all counts in the complaint was denied. It may have been denied for the reason that, under *Wolfberg* v. *Hunter*, 385 Mass. 390, 400-401 (1982), and *McGrath* v. *Mishara*, 386 Mass. 74, 84-85 (1982), the judgment on the c. 93A count necessarily included "the actual

damages" and superseded the common law count. The plaintiff, however, has chosen to read the denial of the motion as meaning, in effect, that the trial judge opted in the end for treble damages, i.e., an aggregate judgment of $252,163.69, although no such figure appears in the judgment. The remand presents an occasion for whatever additional clarification the trial judge cares to offer in this regard.

The judgment is vacated, and the case is remanded to the Superior Court for the entry of a new judgment structured on single damages of $16,358.67, the question of double or treble damages and the legal fees and costs (if the judge elects to review them) to be determined in the discretion of the trial judge.

*So ordered.*